May it please the Court, and may it please my former law partner, Mr. Bernstein. I'm Nick Gimble, I'm recording in English, and I represent the petitioner, Franklin Ebule, in this immigration matter. Your Honor, the decision of the immigration judge in this case was based solely and squarely on a finding that the petitioner here was not a member of the movement of the actualization of the sovereign state of Biafra. The government now concedes that. Precisely right, Your Honor. But the point is that the fact that the decision was based on that has implications in a variety of respects. Well, isn't it a little hyperbolic to say that the decision rested solely and squarely on that issue? No, Your Honor, I don't think it is hyperbolic to say that. Obviously, Your Honor's read the decision and that's what it said, but for example, a number of the points that are raised in the respondent's brief, for example, something about whether or not there has been persecution, or whether there could be relocation, or whether there's been persecution of other family members, those are not findings that were made by the immigration judge. And they are grounds, in essence, supplied in lieu of what was the linchpin of the immigration judge's finding. Really, there were two key aspects here. One, first of all, the finding in the first place, given the fact that there were photo IDs of the petitioner as a member of Mossad. How many people are in Mossad in Nigeria? What's the rough number? I don't know, but it's many. There's no question about it. It's many, and this person was a low-level person, was he not? That's absolutely right, Your Honor. But let me just say that the regulations of the Immigration Service itself talk about the extent to which one needs to show the likelihood of persecution of any individual person. And if I may, it's relatively short. If I have a court's indulgence, I'll read it. This is from HCFR 208-13. And this is subdivision B, it's almost like the IRS code, 2-3-i. In evaluating whether the applicant has sustained the burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that there is a reasonable possibility that he or she would be singled out individually for persecution. And then there's A and B, which are involved. But then he says that, in fact, he was persecuted, but he had a chance to really put together a good I-589. He had a chance to put in various affidavits, and maybe he didn't understand what an affidavit was, but all that he's put in so far is that he heard that there was somebody coming after him, or somebody told him, and then he went to one part, the Inara part of Nigeria. Then he heard that they were looking for him in the Inara portion of Nigeria, so there's the Lagos. Then he hears that maybe they're still looking for him, so he goes to Germany. Then he says in Germany that he understood that Nigerian police were coming after him, and the affidavit, it was told by a friend, but the friend said he only knew it because he was told by Ebele. Well, actually, Your Honor, the friend doesn't just say it. Ebele and other friends is what Victor, I forget his last name, his affidavit says. But there are two points. I perhaps should have gone on and quoted the remainder of that regulation, because you don't have to show that you will be singled out individually. Mr. Gable, can I pick you up from that point? Yes. And this may have been what Judge Ambrose was getting at. If you are correct, would every member of Mossad qualify for asylum? Your Honor, I think that is, I would say it is an implication of the regulation, but I think this case is not. Of your argument. Well, and I think of the regulation, because A and B says, if you're a member of an organization and the applicant establishes that members are subject to, yes, the answer is yes, but this case doesn't solely rely on that. Would you then be looking at the State Department reports and things like that, which appear to, I mean, this is a major outfit, and is there significant persecution of Mossad members, high-ranking Mossad members even, in Nigeria today? Yes. The record evidence that I know of, Your Honor, is that there is persecution. And in the immigration judge at page 133 to 134 of the joint appendix really did not, as I understand it, did not dispute the fact that membership in this organization does make you subject to that. But my point is, to get back to your question, Judge Slavitt, because I think it is, obviously, it doesn't depend on what I say, but it goes to the question of how broad this goes. There is, even apart from the regulation I point to, a lot of individual evidence. There's no question, for example, to take an analogy, members of the French Resistance in the Second World War, they heard, they would hear from somebody that they were being pursued, and the person was shot at. And according to the film that I saw that long ago, they each died. Is there any evidence in the record that Nigerian police pursue persons from Mossad in other countries? Your Honor, there is the affidavit that you were referring to before in which Victor, I don't remember the last name, did say that he heard not only from Mr. Akulu, but also from friends that Nigerian police were doing that. But more generally, no. But here, there was evidence that he was shot at. This person, individually, was shot at. As part of a rally. He wasn't injured. No, he was not. But the point is... Everybody was shot at. Everybody who went there. So that goes back to my original question, which is, are all Mossad members eligible for asylum? Can we really write an opinion that says that? Well, you don't have to. But I would submit a few, because I think the question is, what sort of corroboration can one reasonably provide? Do you have to actually wait until somebody uncovers your covet? And before you can actually... There would be no applicants. They'd all be dead if they were found. Mr. Gimbel, it is the case that the immigration judge said Mr. Akulu hadn't effectively made a demonstration of membership in Mossad. Whatever the form of words was. And as I think you've pointed out, the government... We understand from Mr. Bernstein's brief that the government acknowledges that he was a member of Mossad. But I'm not really clear that that's the fulcrum of the case at this point, because passing for a moment the question whether everybody in Mossad is a potential applicant for asylum or candidate for demonstrating persecution, surely the immigration judge's opinion in this case is one into which you can plug, yes, all right, he was a member of Mossad. But the immigration judge's statements then go to whether he was subjected, among other things, to an appropriate level of threat to qualify for the relief sort. Isn't that true? Your Honor, I submit that that is not true. Because if one looks at the quality of the fact-finding, if one is making a finding that he's not a member, when you're confronted with photo IDs, and you look at the colloquy about the dates in the affidavit, if one were reviewing the quality of fact-finding, say coming up from a trial court here, where you had a judge who was making a finding of non-membership when there were photo IDs, when the Bureau of Immigration Appeals conceded that he made a mistake about the February incident, and one should be instructed to look at the quality of the interchange between the immigration judge. That appears at pages 217 to 218 of the record. Probably best to start at 216 to 218. And you look then at the quality of what was going on. The substantial evidence test talks about something that a fair, reasonable evidence taken on the record as a whole. So I think to go in substituting that way, when one has a fact-finding that is in a number of respects radically flawed, it's really asking, there is evidence that it was not a proper finding of fact. So I would respectfully say that one can't just go around substituting findings of fact. Let me ask you, let me interject just, did you ask for rebuttal time? I'm sorry, I have three minutes if I may. So I only have one minute and 18 seconds. No, no, that's all right. I'm not rushing you through this. I just sometimes forget. And you did ask, right Greg? I didn't, I asked before, but I forgot to ask when I was sequencing. Okay, well you're granted that. Now go ahead, I'm not, Judge Amber was going to ask the question. What about the adverse credibility ruling? Isn't there substantial evidence that supports that? Well, when there is an adverse credibility, it's much the same answer that I gave to Judge Pollack. If you have somebody making a finding of fact that is clearly, so clearly wrong. How is that so clearly wrong? Isn't there really quite a bit, I mean, more than substantial evidence to show that his I-589 form was at, which he had many continuances to get right, was way off base. If I may, no. First of all, the one is the finding of idea, I have no idea, the membership of it, or photo ideas, the business about the age, the February, the business about the February meeting. And I think that one has to look at the issue. He did it on the driver's license, for example. He just speculated that they somehow knew he was a member of Mossad from his license, which in fact they didn't. Well, if I could just answer your prior question, once you look at the I-589, I think, in terms of whether there's an omission, really it's a question of, it's done per se, and the question is, did it address something where one would be expected, is the omission something where he was already talking about it, or was it just written at such a high level of generality, that what it really means, that it wasn't a very well-drafted document. In other words, if he's describing something in detail and then omits it, then the omission, I submit to you, would be more significant. But if it's just a very general document, I'm not sure that the same inference really could be true. The I-589 is not just a very general document. This person got extension after extension after extension in order to try to get it right, and yet it still came out far from what he's now saying. No, Your Honor, it did not diverge. It was very general. He did not write as complete a document. That's not the same thing as an inconsistency, I submit to you. It is true that there could have been a lot more detail in that I-589, but it's not the same thing as saying that he wrote something and then changed it. For example, at one point he claimed that a Mossad could officially register a vehicle. That's not true, is it? It was true at the time of this incident. Is Mossad a legal or illegal organization? At the time of the incident, it was legal, as I understand it. There's a footnote in our opening brief. But if I could just very briefly answer your question about, it is not speculation about how they could identify it. It was a rally on a Mossad compound. It was a bus bringing people to a demonstration. If you see a bus with a demonstration, they come bring people to a demonstration. The idea that the person who's driving it, that's not speculative at all, I would submit to you. Now, does he know that, did he actually see somebody go into the glove compartment? No. But on the other hand, if it were really incumbent on every asylum seeker to show exactly how the secret police got their information, again, it would impose a very difficult burden. But certainly, there's a reasonable inference that there's somebody there monitoring that. It's a rally on Mossad grounds, and it was a bus bringing people to that rally. Help me with the facts. There are two incidents that he now claims show a basis for his fear of persecution. The first one was this rally at which the police shot at people, and he didn't get shot. And the second was when there was this meeting and they burnt down the bus, among other things. Am I wrong, or are they conflated? They're not conflated. They're two separate incidents. They're two separate incidents. Okay, thank you. We're talking about the February and December 01. That's correct, Your Honor. There was a mistake. There's no question there was an error in the dating, and that point is addressed in our papers. Thank you. And he didn't include the first incident in his I-589. No, he did, Your Honor. He did. But it was referred to briefly in the sentence. It's there, but it is not dated well. There's no question that there is an issue about that. Okay, thank you. Thank you, Your Honor. We'll hear from the government. Good morning, Your Honors. May it please the Court, and may it please my former partner, Mr. Gimbel. Okay, please put down the mic so we'll get you on tape on this now. Is this okay? Is that okay, Greg? We haven't yet heard what Mr. Gimbel... He hasn't said who he is yet. In whom I hold in the highest possible personal and professional skills that he has. Okay, that's fine. But you have to tell us who you are. I apologize. My name is Richard Bernstein. I'm an assistant United States attorney, and I represent the government. Okay. Mr. Bernstein, you've said that you hold Mr. Gimbel in the highest possible esteem, but you haven't told us whether what he said pleases you. Oh, absolutely not, Your Honor. It does not please me in the least, but he's only doing his job. If I may, I'd like to pick up on something. His job is as a volunteer at Cornell, and we are very grateful for people who accept these cases pro bono. As well you should, Your Honor. And I must say, if I might, because I spend so much time on immigration work, I have not seen in five years and perhaps 300 cases, papers of this quality. You know, Mr. Bernstein, what we usually get now is people from the tax department, people from all sorts of departments other than oil, which knows about this stuff, who come in and really don't know what the law is. So it's nice to have somebody who says he spends a lot of time on immigration cases. We're about to find out, Your Honor, if this is so. Let me ask you a question. Sure. Why shouldn't we send this back to the immigration, well, BIA to send back to the immigration judge, to say at least one central finding of the IJ was inaccurate and the government now concedes that he was a member of MESAB, and MESAB is an organization that is not held in the highest esteem by the Nigeria government, unlike this, and therefore let the immigration judge take another look at it. Why shouldn't we do that? Your Honor, I think the best answer to that is a case that came out of the Second Circuit early last year. It's called Chen v. Attorney General. I'll hand the copy to Ms. McGill. They're all called Chen v. Attorney General. Here we go. It's the Attorney General case, Your Honor. It's 434, fed 3rd at 144, and the operative language is at 158, and I think it's particularly a posit for this matter and directly addresses Your Honor's question. And it says, notwithstanding errors in the IJ's opinion, if the court is persuaded that nothing will really change at the bottom line if the case goes back, that the result will be the same, it will not be manned. Well, how do we know if it doesn't get back to the, I mean, why can't we? For example, does the Nigerian government have a pattern of practice of persecuting MESAB members? Certainly, and we can see that MESAB members are exposed to a great deal of violence. I do not believe that there is a record in this case that would support a finding or a holding by this court that membership in MESAB per se entitles one to asylum, which is, I think, where this has to come out. And in that regard, we analogize in our papers, albeit by implication, to the Indonesian situation where, while the court, this court, has held that there is no pattern or practice of persecution against Chinese Christians such that the mere fact of being Chinese and being a Christian entitles to you asylum, nonetheless, there are Chinese Christians who have prevailed in asylum cases. Well, but in the Indonesian situation, we have relied on recent State Department advisories, whatever they're called, country reports, that state that things have changed and it's a little better. Now, do we have anything like that with respect to MESAB in Nigeria? I don't think I can answer that question fairly. I just don't know at the level of detail that I think I would need to have fairly to answer your honest question. On this record, though, it would seem that, so far as we can tell, from Mr. Egbuli's experience, just being a member of the MESAB, without more, does not expose a person to such a fear of persecution as would entitle that person to asylum under the statute. Objectively or subjectively? Well, it's a combination, Your Honor. They're both for persecution. It's subjective in the sense that the person has a, and we laid that out in our papers under the standards, there is a subjective test in that the person must have a sincere belief. And you're not claiming that Mr. Egbuli doesn't have a sincere belief? I have no basis to dispute that, Your Honor. But then there's an objective test. We've got to get to that. There's an objective test, and that's would the reasonable person in Mr. Egbuli's situation have a well-founded fear of persecution. Well, he was shot at. But I think as Judge Ambrose pointed out, yes, there was a crowd. There was a violent outburst, and lots of people were shot at. You mean he was an equal opportunity victim? I'm not sure I would put it exactly that way, Your Honor. Well, I was just trying it out. Mr. Gimbel quoted a regulation to us. I think the cases are clear that at some level, the person as an individual has to have both a subjective and an objective fear of persecution. As defined by cases such as Levi Ashcroft in this circuit. If in fact they were looking for him as an individual, and your brief questions, the proof, I wouldn't say the veracity, but the proof that they were in fact, If in fact they were looking for him as an individual or questioned about him, what does that do to your argument that he was not single now? That's a hypothetical, Your Honor, and I'm going to accept that for purposes of my answer. There was an if. He's got a much better case. But I don't think that's our case. And the reason is that there is an adverse credibility finding. I respectfully disagree with Mr. Gimbel's assertion that the entirety of the IJ's opinion went off on an admittedly erroneous and obvious. We concede that determination about Mossad membership. But there were other frailties of a material nature in the case, including, if I might just finish my sentence, at least three and really probably four material inconsistencies between the testimony and the I-589. Conjecture as to whether or not the police had a duplicate of the license, and if so, how. Thirdly, much of the case. That was one. I didn't hear a second. One of the inconsistencies. Two is that the photo duplication, the whole conjecture that the police had a photo duplicate of the license, A, does not appear in the I-589. And B, it's highly speculative, as I think Judge Ambrose said. Three, the hearsay character of the evidence is troubling. And four, in that connection, there's a lack of corroboration, where I think corroboration could have been expected. Well, that's what I want to ask you about. The IJ, well, if I understand the facts, he offered evidence at the BIA level of the affidavits, not at the IJ level. And the BIA said, we're not the place that you should have offered this. You should have offered this at the, we don't take evidence, as we know. And he should have offered it at the IJ level. And so my question to you is, if we consider that the IJ's error in doubting that he was a Mossad member warrants a remand, on remand, would it help if he offered the affidavits that he hadn't offered before at the IJ level? And then we said to the IJ, well, reconsider whether you want to accept these or not. We can't tell the IJ to accept them, but reconsider that together with the fact that the government concedes he's a Mossad member. Where do we stand on that? I think not, Your Honor, with all due respect. And let me explain why. I'm not sure that Your Honor exactly captures what the BIA said. I think what they said is not that, hey, we're not the people to give this information to. I think what they're saying is this could have been developed before. That's right. That's what they said. So is that the same? Well, the question is whether it's truly newly discovered information of the sort, which in fairness ought to be considered, or considering, and Judge Ambrose referenced this several times, that were repeated adjournments of the proceedings so that petitioner would have a chance to find a lawyer, if possible, and to develop new data. There were, I think, five affidavits. Two are from McCotter in English. I think we were agreed that that's the one. He was in custody, was he not? Pardon me? He was in custody throughout this period of many adjournments. Do not dispute that, Your Honor. So it wasn't easy for him to go out and find Mr. Gimbel. The problem I think he would have, just from a practical point of view, is how could an uncounseled person who's incarcerated obtain affidavits, even if he knew what an affidavit is? He succeeded in communicating both, as I understand his testimony, with his mother and his former landlord, Mr. Ogierico, from whom one would have expected a letter or an affidavit or some statement because he is allegedly the source of a lot of the information about Nigerian authorities looking for Mr. Egbuli. I think what, Your Honor, the concern I have, and I do not dispute that it is difficult, and I am sympathetic to the plight of a person who is in custody in a strange land without a lawyer. He himself is not a lawyer. But the end of that road analytically might be a holding that the absence of corroboration, inconsistencies in petition's theory and evidence are to be excused if he doesn't have a lawyer and he's in jail at the time of the proceeding. And yet it's been held innumerable times that there is no right per se to counsel. There is a right to counsel at petitioner's own expense, but not in the sense that we have it in the criminal context. I don't dispute what Your Honor is saying. Judge Pollack? I'm not sure. I don't care who. I'm happy to answer any questions I would like to. I don't believe I fairly addressed Judge Slavitt's question, but I'm happy to. Oh, I should go first, because I asked it first. I think the gist, Your Honor's question, is shouldn't we send this back so the IJ can consider the supplemental data? To consider whether to accept the supplemental data. Sure. The problem is the supplemental data, in our view, does not advance Mr. Egbuli's case. There were two affidavits from Nigerians, Mr. Bath and Mr. Ibe. They are infected with the same hearsay problems and generalities, which in our view undermines much of Mr. Egbuli's case. In fact, one of them says, I heard from Mr. Egbuli. The rules of evidence don't apply to immigration cases, correct? Pardon me? The rules of evidence don't apply to immigration cases. That's true, Your Honor, but the rule of hearsay is they heard. And that's what Mr. Egbuli is saying, I heard. I heard from Mr. Onoyo, who heard from friends who heard from my landlord, that people were looking for me. And that is a problem. And that was referenced by the IJ. Then there's Mr. Egbuli's affidavit, which again, obviously much more sophisticated and crap, going to the good offices of Mr. Kimball, but again, doesn't really go materially beyond where he was at the hearing and the same problems of inconsistency, with all due respect, still plague his case. Mr. Burns, at the start of your argument, Judge Sloboda asked, why shouldn't we send this back to the BIA, given your acknowledgement for the government that he was a member? And you said, well, as I understand it, the Second Circuit has answered that question in Chen. Now, assuming the Second Circuit is regarded by the Third Circuit as a reasonably common accord, then I want you to tell me how you write the opinion, which says Chen tells us that we don't need to send the thing back, when it's not going to make any difference. Now, at that point, you write an opinion saying it's not going to make any difference that he was a member of Mossad, because we can tell, we, the Court of Appeals can tell, that the BIA would not have had a different view of the validity of the IJ's analysis of the case? Your Honor, my time is up, but I think this is the key to the case, and for whatever reason, I didn't finish my answer to Judge Sloboda's question, because there is substantial evidence to support the findings by the IJ and the BIA, as that term is understood as a term of art in the statute, as noted in the Elias Zacharias case. You don't think we would be somehow treading on the authority of the BIA, if we were to say the BIA, we know, would have come to the same view. It had the appellate responsibility with respect to the immigration judge, and it was proceeding on the understanding that there was basis for concluding that he wasn't a member of Mossad. Now, the BIA, if told, well, gee, the government says, yes, he was a member of Mossad, we are to opine and hold that the BIA would have come to the same conclusion? This goes back to the question that I think you asked, Mr. Gingell, Judge Pollack, isn't the contention that the Mossad membership issue was the sole basis of the IJ's opinion hyperbolic? I couldn't agree more, Your Honor. There is much more to this case than the Mossad membership, and once you get by that, the government respectfully submits that there is substantial evidence in this record, again, as understood in 1252b4b, as enunciated in Justice Scalia's opinion in Elias Zacharias, more than sufficient substantial evidence to support the adverse credibility finding based on all these other events, many of which are not even referenced in the I-589 application. Mr. Bernstein, in answer to a question that I had raised, which suggested that the BIA didn't consider the evidence, you said I didn't phrase it right, but I've just looked at the BIA's opinion on page, I can't see it, four of the joint appendix, and they do say, we do not consider evidence first offered on appeal as our review is a review of the record created before the immigration judge. And then they say the proper time, etc. And then they say, however, they suggest that anyway, well, that it couldn't have been produced, but they never really say that if the IJ had it, it wouldn't have made a difference, do they? And we do all the time, we say, I know, in the usual case, we always say, well, we're not going to, the IJ didn't, the BIA didn't look at it, and it's not our business to do all that. But I just wonder whether it would have made a difference. Let me pick up on Judge Pollack's point that we can't talk for the BIA, but we can't talk for the IJ either. Your Honor, again, forgive me if I misspoke. What's in front of the BIA here is a motion to remand, to consider new evidence. If you look at the evidence, it does not address the deficiencies. It does not correct the deficiencies in Mr. Igbui's case. If anything, it accentuates them. And the likelihood that the IJ reflecting on these new affidavits would change your mind is so small in our view that to send it back where the result will be the same is, at least in the Second Circuit's view, something that shouldn't be done. I think Judge Ambrose had a question, and Judge Pollack's question, I think he can. Do you still have a question? No, I'm done. No? No? Okay. Thank you, Mr. Ramsey. Thank you very much, Your Honor. Mr. Ramsey, we'd like you to come back again. I'm tired of hearing from tax attorneys to U.S. attorneys who don't know any information. I think what's happened— We know what's happened. Because I'm in the midst of this. I think OIL has hired a bunch of new people who are going to work on—I think, I'm guessing. I don't know for sure, but there's been something of a drop-off in the volume of cases, Your Honor. Yeah, because for a while, there were so many cases that they were just parceling them out to every— Yeah, we know. We know what's going on because it comes before us. Thank you, Your Honor. Okay, thanks, Mr. Bernstein. Mr. Gimbel, you have three minutes rebuttal time. Thank you. There are five points that I would like to address quickly. First is the issue of inconsistencies that have been addressed at length in our papers. And the real question is, inconsistencies as to what? I think there is some degree of generality in the point as stated by the government, but I don't—it's addressed in our papers as just— to say inconsistent is only the beginning as to what and how material. Second has to do with the issue of— because there was much mention in the immigration judge's opinion of what was omitted from the application. I addressed that in the colloquy with Judge Ambrose. But, again, I think the way—there is— mere omission, of course, is not the question. It is what does it indicate. And I would respectfully submit to you that the fact— the significance of an omission really has to be judged in the context of how detailed the document was. It may be that the document should have been more detailed, but as to whether or not it looks like a credibility issue, that really has to be judged in terms of the context. Not whether somebody would qualify for a position at a law firm because he writes good affidavits. That might be a per se criterion for exclusion. But whether or not the degree of what is stated suggests inconsistency. The third is there are issues raised as to credibility. Again, the question is credibility as to what? And, again, one can't just suggest a point generally. The fourth, actually, is a point that I think Judge Ambrose has addressed. Hearsay is not by itself a reason not to take input. But I think that raises—that goes to a fifth and more general point. But the affidavit of the person in Germany was hearsay on hearsay. That is—he said that he had heard from Mr. Bullock and from friends. That's correct. It depends on whether or not—the person from Germany wasn't there, so strictly speaking, it is double hearsay. There's no question. If one were to take that person as if he had been testifying, it's single hearsay. But you're right. Technically speaking, an affidavit from somewhere else makes it double hearsay. But the question is what sort of corroboration can one reasonably expect? In a situation where you're talking about the secret police are looking for me, who is going to put up an affidavit that gives the details of something like that? We get that all the time, though. In other words, this isn't unique. In all the immigration cases, they say we can't provide corroboration because the government— I mean, because they're political—alleged political assilies, and they say, well, the government's in control of the information. Nobody wants to come forward. So if you're right, we almost can never ask for corroboration. And I think there's an opinion by Judge—now Justice Alito—on that issue. Well, there's also an opinion by Judge McKee, which is the—and I—pardon my pronunciation. Why don't I give the cite? It's 157 Fed 3rd, 210. Starts with S. And it talks about—one of the things it says is corroboration is not required to establish credibility. I notice that my red light is on. No, that's all right. We haven't stopped you. We'll stop you. Corroboration is not required to establish credibility. The law allows one seeking refugee status to, quote, his internal quote, prove his persecution claim with his own testimony if it is credible, quote. There's one last point, if I may, and this may be slight poaching. If one can show persecution, there's a presumption established in favor of the applicant. Yeah, but he can't show past persecution. I think the— Well, I think—I mean, we—past persecution, we have cases where they throw them in jail, where they've been beaten. He doesn't—he doesn't begin to show the kind of past persecution that we've held constitutes past persecution. And then we hold, but there's nothing to show that he'll be persecuted again in the future. I mean, you know, we have these tapes. They're now, I think, 25 percent of our case list. Well, other than your statement that he almost took a bullet for the team, but— Well, that's considered to be a sacrifice in some circumstances. But anyway, I would, again, refer—I don't think the regulation that I quoted at the beginning of my opening argument should be read out of the law. It's there, and I commit it to your consideration. Thank you very much. Thank you very much. Thank you. Thank you once again. Thank you for pro bono volunteering. Thank you, Mr. Bernstein, for coming and giving us the benefit of your background. Please rise.